1  PACIFIC TRIAL ATTORNEYS
   A Professional Corporation
2  Scott J. Ferrell, Bar No. 202091
   sferrell@pacifictrialattorneys.com
3  4100 Newport Place Drive, Ste. 800
   Newport Beach, CA  92660
4  Tel: (949) 706-6464
   Fax: (949) 706-6469
5
   Attorneys for Plaintiff
6

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  JOSE LICEA, individually and on behalf      Case No. 3:22-cv-01567-JO
    of all others similarly situated,
12
              Plaintiff,
13
              v.                                **SECOND AMENDED CLASS
14                                               ACTION COMPLAINT**
    GENESCO, INC.,
15
              Defendant.
16
                                                Filed: October 12, 2022
17                                               Trial Date: None Set

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant Genesco, Inc. ("Defendant") secretly enables and allows a third-party spyware company to wiretap and eavesdrop upon the private conversations of everyone who communicates through the chat feature at https://www.journeys.com/ (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.

Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq*.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff Jose Licea ("Plaintiff"), there are believed to be at least 5,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $25,000,0000 exclusive of interests and costs. *See* Cal. Penal Code § 637.2(a)(1).

2. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3. Defendant is subject to personal jurisdiction in this state under Penal Code Section 502(j), which provides that a person who causes, by any means, the access of a computer in California from another jurisdiction is deemed to have personally accessed the computer in California because Defendant placed a tracking "cookie" on Plaintiff's device when Plaintiff visited Defendant's website. Defendant is also subject to jurisdiction in this state under California's "long-arm" statute found at California Code

of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."  Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of revenues from its website based upon interactions with Californians (including instances in which the website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California."  Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

**PARTIES**

4.     Plaintiff is a resident and citizen of California.  In August 2022 while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature.  Plaintiff was not advised that the chat was monitored, intercepted, or recorded, nor did he consent thereto.

5.     Defendant is a publicly traded corporation that is a "footwear-focused specialty retailer and branded company with more than 1,400 stores in the U.S., Canada, the U.K. and Republic of Ireland" and more than 80 stores in California.  *See* https://www.genesco.com/ (last visited Jul. 13, 2023).  It reports total net sales of $2.4 billion and $466 million in digital revenue.  *Id.*

6.     Defendant owns, operates, and/or controls the Website.

**FACTUAL ALLEGATIONS**

**A.     Background of CIPA.**

7.     CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication.  "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]"

*Javier v. Assurance IQ, LLC*, 2023 WL 114225, at \*6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device").  "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at \*6.

8.    Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[1]

9.    Unlike most companies, Defendant *ignores* CIPA.  Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations.  Why?  Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service.  At your fingertips, you have valuable customer insight to make informed business decisions. . . .**When people are chatting, you have direct access to their exact pain points.***").  *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts  (last visited Jul. 13, 2023) (emphasis added).

10.    Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

---

[1]    https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*[C]ompliance [with CIPA] is not difficult.  A business must take certain steps, as part of its privacy program, to ensure that **any time the business is gathering**, either automatically, or **with a chat feature, personal data of a consumer/website visitor**, that it obtains valid consent consistent with the holdings and determinations of the courts interpreting CIPA and other applicable Data Privacy laws.*") (last visited Jul. 13, 2023) (emphasis added).

**B.      Defendant Allows Salesforce to Intercept Consumers' Chats During Transmission.**

11.      To enable the eavesdropping, Defendant has allowed a third party, Salesforce, to covertly embed its chat technology code into Defendant's chat feature which allows "Salesforce [to] automatically create[] a transcript for each chat session." *See* https://help.salesforce.com/s/articleView?id=sf.live_agent_chat_transcripts.htm&type= 5 (last visited Jul. 14, 2023).

12.      When a Website user opts to utilize the chat feature, they are first prompted to provide personally identifying information ("PII") that is mandatory to engage with the chat:

**FIGURE 1**



13.      This PII is automatically shared with Salesforce when beginning the chat:

**FIGURE 2**

Headers    Payload    Preview    Response    Initiator    Timing    Cookies

▼Request Payload    view source
  ▼ {organizationId: "00D1U000000wd0V", deploymentId: "5721U000000Mril", buttonId: "5731U000000MtCU",…}
    buttonId: "5731U000000MtCU"
    buttonOverrides: []
    deploymentId: "5721U000000Mril"
    isPost: false
    language: "en-US"
    organizationId: "00D1U000000wd0V"
  ▼ prechatDetails: [{label: "First Name", value: "Logan", entityMaps: [], transcriptFields: [], displayToAgent: true,…},…]
    ▶ 0: {label: "First Name", value: "Logan", entityMaps: [], transcriptFields: [], displayToAgent: true,…}
    ▶ 1: {label: "Last Name", value: "Dawson", entityMaps: [], transcriptFields: [], displayToAgent: true,…}
    ▶ 2: {label: "Email", value: "jebot17643@akoption.com", entityMaps: [], transcriptFields: [],…}
    ▶ 3: {label: "Company", value: "Journeys", entityMaps: [], transcriptFields: [], displayToAgent: true,…}
    ▶ 4: {label: "eswLiveAgentDevName", value: "EmbeddedServiceLiveAgent_Parent04I1U000000CiOUUA0_16bf5a35948",…}
    ▶ 5: {label: "hasOnlyExtraPrechatInfo", value: false, entityMaps: [], transcriptFields: [],…}
  ▶ prechatEntities: [,…]
    receiveQueueUpdates: false
    screenResolution: "1920x1080"
    sessionId: null
    trackingId: ""
    userAgent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/114.0.0.0 Safari
  ▶ visitorInfo: {visitCount: 2, originalReferrer: "",…}
    visitorName: "Logan"

14.     As a user chats on the Website, Defendant permits and enables Salesforce to intercept the incoming chats in real-time:

**FIGURE 3**



**FIGURE 4**



**FIGURE 5**

15.      In fact, Salesforce is receiving the intercepted chats *as they are being typed by the user*, not just when the use presses "enter":

**FIGURE 6**



**FIGURE 7**



SECOND AMENDED CLASS ACTION COMPLAINT                                           3:22-cv-01567-JO

16.    In other words, before the chat even gets to Defendant, Salesforce is intercepting it, copying it, and then forwarding it along to Defendant.  The chats meant for Defendant are first routed *through* Salesforce.

17.    As shown above, the secret code is a type of automatic routing software that automatically acquires and transmits user chat communications to Salesforce without any active input from either Defendant's employees, agents, or human representatives, or Salesforce's employees, agents, or human representatives.

18.    One might reasonably wonder why Salesforce would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website.  As shown below, it all about money.

19.    The Salesforce software is integrated with social media platforms like Facebook: "Create personalized experiences that are connected across channels — from your website, mobile app, SMS, WhatsApp, Facebook Messenger, and more."  *See* https://www.salesforce.com/products/contact-center/  (last visited Jul 14, 2023); https://tray.io/blog/facebook-lead-ads-salesforce ("Facebook lead ads are an excellent channel to target sales prospects, and pay dividends when you can connect your lead ads data with your CRM, such as Salesforce.") (last visited Jul. 12, 2023).  The integration allows various software sub-systems to share data to operate as a unified system.  According to Bloomberg.com, this is all part of Meta's secret "plan to profit from private chats."  As Bloomberg explained, Meta's software integration "can

manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger." *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last visited Jul 14, 2023) (emphasis added).

20.   So how does it work?  First, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with Salesforce's software.  Second, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. Third and finally, after the chat transcripts intercepted by Salesforce are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising based upon the user's Website visits, chats and interactions.

21.   Through the preceding acts, Meta subsidiaries can freely boast that they can "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers." *See* https://www.kustomer.com/product/customer-service/ (last visited Jul. 14, 2023). Indeed, all of the schemers – Defendant, Salesforce, and Meta – all profit from secretly exploiting the chat data through targeted social media advertising because "Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. . . . Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests."  *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited Jul. 14, 2023).

22.    As such, Salesforce does more than merely provide a storage function for Website users' chat communications with Defendant.  It is more than the proverbial "tape-recorder" in the hand of Defendant.  Instead, Salesforce uses its record of Website users' interactions with Defendant's chat feature for data analytics and marketing/advertising to consumers.  Salesforce's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under section 631(a), rather than a mere extension of Defendant and/or party to the communication with Website visitors.

23.    Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting Salesforce to intercept and eavesdrop on the conversations during transmission, or that Salesforce provided data from such transcripts to Meta and similar entities through "integration" of their softwares.

24.    Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.  Indeed, as shown in Figures 1 and 3, there is nothing on the chat function to even tend to indicate or disclose Salesforce is involved.

## CLASS ALLEGATIONS

25.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within the state of California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

26.   <u>NUMEROSITY</u>: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

27.   <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a.   Whether Defendant caused electronic communications from class members with the Website to be recorded, intercepted, and/or monitored by a third party;

b.   Whether Defendant aided and abetted the third party in eavesdropping on such communications;

c.   Whether Plaintiff and Class Members are entitled to statutory penalties; and

d.   Whether Class Members are entitled to injunctive relief.

28.   <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose chat was recorded, intercepted and eavesdropped upon without prior knowledge or consent, Plaintiff is asserting claims that are typical of the Class.

29.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

30.   <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.  Even if every Class Member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

**CAUSE OF ACTION**

**Violations of the California Invasion of Privacy Act**

**Cal. Penal Code § 631(a)**

31.     Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" or (4) "**who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.**" (emphasis added).

32.     Here, Defendant "aids, agrees with, employs, [and] conspires with [Salesforce]" to willfully, and without the consent of Plaintiff or other members of the class, to read and learn the contents and meaning of the chat communications of the Website users while in transit within this state.  Defendant and Salesforce then use and communicate the information so obtained with yet more parties to target and specifically market to Plaintiff and the class for Defendant's and Salesforce's own monetary gain.

33.     Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website.  "Though written in terms of wiretapping, Section 631(a) applies to Internet communications.  It makes liable anyone who 'reads,

or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022).

34.     Salesforce's software embedded on the Website by Defendant to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

35.     At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded by Salesforce in real time.

36.     Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

37.     Defendant's conduct constitutes a violation of the fourth clause of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

2.     An order declaring Defendant's conduct violates CIPA;

3.     An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;

4.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5.     Statutory damages pursuant to CIPA;

6.     Prejudgment interest;

7.     Reasonable attorneys' fees and costs; and

8.      All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  October 16, 2023                    PACIFIC TRIAL ATTORNEYS, APC

By:_____

Scott. J. Ferrell
Attorneys for Plaintiff

1

## CERTIFICATE OF SERVICE

2     I hereby certify that on March 8, 2023, I electronically filed the foregoing

3  **SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court

4  using the CM/ECF system which will send notification of such filing via electronic mail

5  to all counsel of record.

6

7

Dated:  October 16, 2023

8

9                                                */s/ Scott J. Ferrell*
                                                   Scott J. Ferrell
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28